**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION**

**JOE WALKER, II**                                                                                          **PLAINTIFF**

v.                                           **2:07CV00067 BSM**

**MR. MAINTENANCE, INC.;
and UNION PACIFIC RAILROAD CO.**                                              **DEFENDANTS**

**ORDER**

Before the court are the separate summary judgment motions of defendants, Union Pacific Railroad Company ("UP") and Mr. Maintenance, Inc.; the motion for continuance or to extend the discovery cutoff of plaintiff Joe Walker; and a motion in limine filed by Mr. Maintenance.

I.  FACTUAL BACKGROUND

Walker was injured in a workplace fall on April 6, 2005.  At the time, Walker was employed by H & M International Transportation, Inc. ("H & M") as a hostler driver.  On that day, at approximately 3:30 a.m., Walker began his shift at the Ebony Yard in Marion, Arkansas.  The Ebony Yard is a rail terminal where H&M loads and unloads intermodal cargo containers from trains and tractor trailers.  Ex. D, Walker dep. p. 68, defendant Union Pacific Railroad's motion for summary judgment ("UP's motion").

In his deposition, Walker stated that on the day in question, he was told by another H & M employee that, during the night shift, a crane had blown hydraulic fluid and had spread oil all up and down the area where the crane travels and along the path where the crane had been brought to the shop.  Ex. D, Walker dep. pp. 35-38, 66, defendant Union Pacific

Railroad's motion for summary judgment ("UP's motion"). *Id*. at 37. This information was provided to Walker before the accident that forms the basis of this lawsuit. *Id.* Walker was told that the crane had broken down sometime between 8:00 p.m. and 4:00 a.m, and he states that no H & M employee or Mr. Maintenance, Inc. ("MMI") employee had attempted to clean up the spill. *Id*. at 66-68. Walker further stated that H & M employees would have moved the crane when it broke down because they use the cranes, but do not work on them. *Id*. at 64. Walker also stated that there were no mechanics or anyone else from MMI working with the cranes that night because they worked "regular daytime shift hours," so "there was none of those guys that take care of it present." *Id*. at 64. Walker had previously seen cranes leak hydraulic oil. *Id*. at 63. Walker estimated that, in the area where he fell, there were twenty to thirty yards of oil that were about two and a half feet or three feet wide" *Id*. at 41. Prior to the accident, Walker was placing containers in the area of the spill, in the area of Track 704, for approximately two hours, and placed approximately eight to ten containers per hour. *Id*. at 39. Walker stated that he does not recall reporting the oil spill to anyone. *Id*. at 63.

Walker testified that, just before he fell, he parked his truck and went around to unlock the container, but did not see oil at that time because "the lighting wasn't great over there." *Id*. at 42. He explained that one could see it down the track with the lights reflecting off of it, but "if you park right beside it, you wouldn't – in the dark of the pavement and all, I didn't see it right then, no. I had seen it before but didn't see it right then." *Id*. at 42.

Walker's deposition testimony indicates that the fall took place at around 5:30 a.m. on Track 4. *Id.* at 67; Ex. D, Walker dep. pp. 31, 36, MMI's motion for summary judgment ("MMI's motion").

Walker testified that, at night, he thought only one UP employee worked, stating, "[t]hey are a figurative representation of them, and H&M runs what's going on out there." Ex. D, Walker dep. p. 48, UP's motion. Walker testified that he thought MMI was responsible for maintaining the cranes. *Id.* at 62.

UP contracted with H & M to provide intermodal operating services, including "loading and loading trailers from rail cars, providing intermodal gate inspection, hostling, and other associated services." Ex. A, H & M contract, UP's motion. The contract requires H & M to "provide a safe work place environment" and "adhere to guidelines shown in the Specifications," Ex. A, H & M contract § 10. As required by the contract, H & M leased the premises at Ebony Yard as shown in Exhibit 2 and 2a attached to the lease, the Trackage (including Ramp Tracks 1 through 4) and 8.5 feet on each side of such Trackage, and the maintenance and administration buildings "for the sole purpose of loading and unloading rail containers, and purposes incidental thereto . . . ." *Id.* at § 3 and specifications; Ex. B, lease, Article I, UP's motion. The lease provides that H & M "at its expense, shall maintain the Trackage to the standards and acceptance of Lessor," and "[i]f in the judgment of [UP], any portion of the Trackage is not being maintained and/or repaired properly, or is non-conforming and/or unsafe for railroad operations, [UP] may repair such portions of Trackage

at Lessee's expense." Ex. B, lease, Article IV, UP's motion.  The lease also requires that H & M "at its sole expense, shall remove snow, ice, sand and other substances as needed to permit safe operation over the Trackage," and that H & M "maintain all appu[r]tenances to the Trackage (other than an automatic signal system), including without limitation, any gates or fences constructed by [H & M] or by [UP] for [H & M's] use and benefit, and any loading or unloading devices and warning signs above, below or beside the Trackage." *Id.* Exhibit 1 to the lease requires H & M to "keep the Leased Property in a safe, neat, clean and presentable condition, and in good condition and repair."  Ex. B, lease, Exhibit 1, UP's motion.  Section 6 to Exhibit 1 provides as follows:

> A.   Except as provided in paragraph B below, [H & M] at [H & M's] expense, shall maintain the Premises.
>
> B.   [UP] shall not be required to make any repairs, alterations, additions or improvements to or upon the Buildings during the term of this Lease, except that [UP] will make any necessary repairs to the roof, exterior walls and foundation of the Building(s) within a reasonable time after receipt of written notice from [H & M] of defects therein. [H & M's] responsibility for maintenance shall include, without limitation, overhead doors, loading docks, outside light poles, gutters, downspouts, interior floors, walls, ceilings, plumbing, heating plant, electric wiring and fixtures, and all glass in the Building(s), whether such maintenance and repair are necessitated by ordinary wear and tear, or by act, omission or neglect of [H & M] or [H & M's] customers, licensees or invitees, or due to casualty, explosion or fire, howsoever caused, the elements, or any cause or happening not due to the negligence of [H & M] or beyond [H & M's] control. If [H & M] fails or neglects to maintain or repair the Premises or the Building(s), [UP] after giving written notice to [H & M], may proceed to make the necessary repairs for the account and at the expense of [H & M], whether with [UP's] own forces or by a contractor or contractors chosen by [UP]; and if [UP] exercises the right hereby reserved, [H &

> M] will pay [UP] the entire expense of all work done or contracted for by [UP] promptly upon receiving a bill or bills therefor. [UP] shall not be under any duty or obligation, however, to make any repairs or perform any maintenance not performed by [H & M], and [UP's] failure to do so shall not relieve [H & M] from any obligation or liability for failure to make such repairs or to perform any maintenance. [UP] shall have the right to inspect the Leased Property at any reasonable time or times to determine the necessity of repairs and [H & M's] compliance with the provisions hereof.

*Id*.

MMI contracted with UP to provide lift equipment maintenance for five cranes at Ebony Yard. Ex. A, MMI contract § 1, MMI's motion. The contract specifications required MMI to "endeavor to perform all normal service and planned maintenance between the hours of 6:00 a.m. and 6:00 p.m., Monday through Sunday, legal Railroad holidays excepted . . . ." *Id*. at ¶ 3. MMI was to "respond in a timely and responsible fashion to breakdown and emergency calls within sixty minutes after call is placed during the hours not specific above with a minimum call out of two (2) hours." *Id*. The MMI contract required MMI to "keep the job site free from safety and health hazards and ensure that its employees are competent and adequately trained in all safety and health aspects of the job." *Id*. at § 16. MMI submits the affidavit of Jeff Lambert, president of MMI, which states that breakdown or emergency calls are directed to his attention, and he did not receive a breakdown or emergency call overnight on April 5-6, 2005. Ex. B, Lambert aff., MMI's motion. Lambert states that MMI was not notified and had no knowledge of a crane breakdown or oil spill from a crane on or around Track 4, also known as Track No. 704. *Id*. Lambert further states that on April 5,

2005, MMI's crane mechanics left at approximately 6:00 p.m., and MMI did not have any mechanics working overnight at Ebony Yard on April 5-6, 2005. *Id*.

## II. SUMMARY JUDGMENT STANDARD & LAW

When considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lundstrom v. Maguire Tank, Inc.*, 509 F.3d 864, 867 (8th Cir. 2007) (citing Fed. R. Civ. P. 56(c)). In this diversity suit based on a theory of negligence, the court applies the law of Arkansas, the forum state. *Depositors Ins. Co. v. Wal-Mart Stores, Inc.*, 506 F.3d 1092, 1094 (8th Cir. 2007).

"It is well settled that the law of negligence requires as essential elements that a duty was owed and that the duty was breached." *Lacy v. Flake & Kelley Mgmt, Inc.*, 366 Ark. 365, 367 (2006). "The issue of whether a duty exists is always a question of law, not to be decided by a trier of fact." *Id*. If no duty of care is owed, summary judgment is appropriate." *Id*.

"At common law the lessor owed no duty of repair of the premises to the lessee." *Thomas v. Stewart*, 347 Ark. 33, 38 (2001). Arkansas follows this caveat lessee rule. *Id*. "Unless a landlord agrees with his tenant to repair the leased premises, he cannot, in the absence of statute, be held liable for repairs." *Id*.; *see also Propst v. McNeill*, 326 Ark. 623, 624 (1996) (rejecting the retention of control exception to caveat lessee and holding that the

landlord was not obligated to pay for any damage to the tenant's plane when the lease had no provision for repairs or maintenance of the hangar). "A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant . . . by a condition of disrepair existing before or arising after the tenant has taken possession if: (1) the landlord, as such, has contracted by a promise in the lease or otherwise to keep the leased property in repair; (2) the disrepair creates an unreasonable risk to persons upon the leased property which the performance of the landlord's agreement would have prevented; and (3) the landlord fails to exercise reasonable care to perform his contract." *Steward v. McDonald*, 330 Ark. 837, 841 (1997). Arkansas has codified the caveat lessee rule as follows:

> No landlord . . . shall be liable to a tenant or a tenant's licensee or invitee for . . . personal injury . . . proximately caused by any defect or disrepair on the premises absent the landlord's:
>
> > (1) Agreement supported by consideration or assumption by conduct of a duty to undertake an obligation to maintain or repair the leased premises; and
> >
> > (2) Failure to perform the agreement or assumed duty in a reasonable manner.

Ark. Code Ann. § 18-16-110.

### III.  MMI'S MOTION FOR SUMMARY JUDGMENT

MMI asserts that it is entitled to summary judgment because the undisputed facts confirm that the alleged oil spill occurred after MMI's contracted hours, and thus, MMI owed no duty to Walker. MMI also asserts that even if MMI owed a duty to Walker, Walker and

H & M were knowledgeable of the oil spill and failed to notify MMI of the oil spill. Thus, MMI contends that it is not possible for a jury to find that MMI failed to use ordinary care under the circumstances and the proximate causes of Walker's injuries are his negligence and the negligence of H&M.

Walker asserts that MMI assumed a duty under its contract with UP to keep the premises safe, and MMI was on actual notice of unsafe conditions due to the constant spilling of oil by cranes, but failed to adequately deal with those conditions. Walker asserts that MMI opted for its employees to only work daytime hours and UP and MMI failed to note that oil was spilled on the pavement during both day and night, resulting in a hazard to the H & M workers on the night shift. Walker asserts that this omission constitutes a negligent omission to perceive and then correct a dangerous condition. Walker contends that MMI was not restricted from dealing with oil spills at night, but opted not to do so, and MMI had no protocol to deal with or receive notification of spills at night.

Walker notes that his co-employee, Drew Roberts, testified that there was "hardly a day that went by that there was not some kind of hydraulic oil leak or break . . . it's a common thing out there." Ex. F, Roberts dep. p. 21, plaintiff's response to the motions for summary judgment ("plaintiff's response"). Roberts also testified that he has, in the past, called MMI employees to tell them about a hydraulic line bust, and MMI came and put Oil Dri or sawdust on the spill, but that was not very effective. Ex. I, Roberts dep. p. 23, plaintiff's response.

The court finds that MMI owed no duty to Walker because it is undisputed that the oil spill occurred after MMI's contracted hours, MMI was not notified of the oil spill prior to the incident, H & M employees were operating the crane when it broke down, and H & M employees moved the crane across the premises. Although Walker asserts that MMI was not restricted from dealing with oil spills at night, there is no indication in the record that MMI was obligated to clean up oil spills occurring outside the contracted hours. Summary judgment in favor of MMI is appropriate.

## IV. UP'S MOTION FOR SUMMARY JUDGMENT

UP asserts that it is not liable to Walker because it had no duty to maintain the property it leased to H & M, or to protect H & M's employees, under the doctrine of caveat lessee. UP states that the lease placed an affirmative obligation on H & M to maintain the premises where the injury is alleged to have occurred.

Walker asserts that the lease between UP and H & M did not assign to H & M a duty to maintain the premises to protect the safety of workers. Rather, Walker asserts that the lease only requires H & M to maintain the maintenance building and the administration building. Additionally, Walker asserts that UP failed to note that oil was spilled on the pavement during both day and night, resulting in a hazard to the H & M workers on the night shift. Walker asserts that this omission constitutes a negligent omission to perceive and then correct a dangerous condition.

Walker also asserts that UP was negligent in failing to keep the premises well lit so that employees could see the oil slicks. Walker states that although multiple lights were inoperable at the time of his fall, UP never contacted Bobby Davis Electric, with whom UP had a contract, to fix the problem. Walker notes that Jodie Davis testified that UP would "let a lot [of the lights] get out before they call us." Ex. L, Davis dep. pp. 11-12, plaintiff's response.

Further, Walker asserts that UP maintained at least joint control of the grounds due to UP signage, patrol of the grounds by the UP police force, the requirement that H & M maintain Trackage to UP's standards, and UP's retention of the right to set the operating rules on the property. In his affidavit, Walker states that although he is not familiar with the contracts in this case, UP kept personnel on the premises at all times, had a manager there during the night shift, and had UP Police occasionally patrol the premises. Ex. H, Walker aff., plaintiff's response. Additionally, Walker notes that the signs posted at the yard only note UP's control over the property, not H&M's. *Id*. Walker also states that UP and MMI should have seen the same oil spills and oily conditions on the property. *Id*.

UP responds by stating that the lease clearly provides that H & M was responsible for maintaining the premises or leased property, including the area where the incident occurred. UP notes that Walker testified that H & M ran the operations and that UP's presence was "figurative." UP asserts that it did not assume any duty to Walker through its conduct, and that only an express agreement or assumption of duty can remove a landlord from the general

rule of non-liability. UP states that Walker has not cited any authority supporting the position that UP's conduct created a duty, and that Walker is essentially making a "retention of control" argument, which has been rejected in Arkansas. UP argues that the cases cited by Walker involve situations where there was no lease of the property in question; rather, the employers of the independent contractors were in full control of the premises.

Finally, UP asserts that its contract with Bobby Davis Electric created no duty to Walker because the contract was entered into well after the lease of the property to H & M, and thus, does not operate to alter the terms of the lease. UP notes that the contract provides that UP is not obligated to give any particular amount of work to Bobby Davis Electric. Furthermore, Jodie Davis, secretary-treasurer of Bobby Davis Electric, testified that H & M employees also called Bobby Davis Electric to perform work under the contract. Ex. F, Davis dep. pp. 14-15, UP's reply. UP also states that even assuming UP's contract with Bobby Davis Electric created a duty, no reasonable juror could find that a lack of lighting led to the alleged injury because Walker was aware of the oil's presence in the area in which he was working.

Here, the lease expressly provides that H & M shall maintain the premises and leased property, including the Trackage and appurtenances. UP only obligated itself to make any necessary repairs to the roof, exterior walls and foundation of the buildings within a reasonable time after receipt of written notice from H & M. It is undisputed that the incident did not occur within or around these areas. Also, Arkansas has declined to adopt the

retention of control exception to the caveat lessee rule, and even if such an exception applied, Walker's own testimony indicates that H & M "runs what's going on out there." Additionally, there is no indication in the record that UP was responsible for cleaning up oil spills. The court finds that UP owed no duty to Walker. The court agrees with UP that the cases cited by Walker do not involve situations where an independent contractor entered into a lease agreement with the owner of the premises, and therefore, do not apply to this case. Finally, Walker testified that he was aware of the oil spill and had worked in the area in which he fell for several hours prior to the fall. UP's motion for summary judgment is granted.

Accordingly, the summary judgment motions of defendants, Mr. Maintenance, Inc. (Doc. Nos. 48 and 49) and Union Pacific Railroad Company (Doc. No. 45), are granted. Plaintiff's motion to continue, or in the alternative, to extend the discovery cutoff (Doc. No. 52) and defendant Mr. Maintenance, Inc.'s motion in limine (Doc. No. 55) are denied as moot. Judgment will be entered accordingly.

IT IS SO ORDERED this 19th day of May, 2009.

_____
UNITED STATES DISTRICT JUDGE